603 F.2d 510
 Nancy N. FERRERO, Plaintiff-Appellee,
United States Fidelity and Guaranty Co., Intervenor-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
Jean Rountree KAVIANI, Plaintiff-Appellee,
Texas Employers Insurance Co., Intervenor-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 76-4430.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 28, 1979.
 
 Leonard Schaitman, Eloise E. Davies, Attys., Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., for defendant-appellant.
 Joseph D. Jamail, S. Gus Kolius, John Gano, Houston, Tex., for plaintiffs-appellees.
 Appeals from the United States District Court for the Southern District of Texas.
 Before AINSWORTH and VANCE, Circuit Judges, and BOOTLE, District Judge.*
 VANCE, Circuit Judge:
 
 
 1
 This is an appeal from judgments for the plaintiffs in two consolidated cases brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680. Both plaintiffs were injured on September 2, 1974, in separate incidents, when they were struck by a car. The automobile's driver was a psychotic former inmate who had walked away from the Veterans Administration Hospital in Waco, Texas, on August 19, 1974.
 
 
 2
 The trial court found that the Veterans Administration was negligent in relying on the psychotic patient to medicate himself, in placing him in an open ward from which he could walk away, in failing to attempt to retrieve him when his departure was discovered, and in failing to confine him when he presented himself for treatment at an outpatient clinic on August 30, 1974. The court awarded each plaintiff $650,000 in damages. The sole issue before us is whether these damages are excessive.
 
 
 3
 In FTCA cases the clearly erroneous standard governs our review of factual determinations, including damages. Williams v. United States, 405 F.2d 234, 239 (5th Cir. 1968); Fed.R.Civ.P. 52(a). Although that standard contemplates deference to the trial judge's opportunity to see and hear the witnesses, our review is not restrained by the statutory and constitutional limitations applicable to our review of a jury's verdict. We judge a trial court's finding to be clearly erroneous when, after reviewing the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 29 L.Ed. 746 (1948).
 
 
 4
 The components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred, which in this case is Texas law. Simpson v. United States, 322 F.2d 688, 690 (5th Cir. 1963); 28 U.S.C. § 1346(b). This rule is limited, however, in that the United States shall not be liable for punitive damages. 28 U.S.C. § 2674.
 
 
 5
 Within this framework, we turn to our review of the injuries suffered and damages sustained by the two plaintiffs.
 
 NANCY N. FERRERO
 
 6
 When the accident occurred, Mrs. Ferrero was fifty-three years old, married, the mother of six children, and a supervisor in the physical therapy department at Valley Baptist Hospital in Harlingen, Texas. An avid sports participant, she especially enjoyed golf, tennis, swimming and bowling.
 
 
 7
 Mrs. Ferrero was hospitalized for two months beginning on the day of the accident. Her discharge summary showed that she had suffered a mild cerebral concussion, scalp lacerations, multiple contusions and abrasions, a severely comminuted compression fracture of her third lumbar vertebra, and a compression fracture of her fifth lumbar vertebra. In prior accidents she had sustained a compression fracture of L-1 and a fracture of L-2 for which she had worn a back brace. With her brace reapplied she was able to walk without pain when discharged.
 
 
 8
 The orthopedic surgeon who treated both plaintiffs described Mrs. Ferrero's injury as quite serious. He said that her type of injury causes pain and soft tissue problems. When he last examined Mrs. Ferrero on August 19, 1976, she could bend and touch the floor, but her motion was predominantly at the hip joint rather than in the spine. He found that bending to the right or left within eighty percent of normal range caused Mrs. Ferrero pain. The cross leg test and straight leg raising, however, were neither restricted nor painful. Hyperextension of the hips also was painless within the full range of motion. No neurological deficits were detected.
 
 
 9
 Mrs. Ferrero's injury is permanent and will slowly worsen with the passage of time. Though this type of injury is often accompanied by premature arthritic changes, her doctor doesn't recall noting any. In his judgment, Mrs. Ferrero's present ailments were caused by the accident.
 
 
 10
 The doctor also testified to his conversation with Mrs. Ferrero during the August 19 examination. She said that she felt pain after four or five hours sleep. Getting up and moving around tended to relieve the pain enough to allow her to go back to sleep. Her back stiffness lessens with activity during the day, but if she stays in one position or rides in a car for two hours or more she again becomes stiff and achey. If she lies on her back with her legs stretched out they become numb. She walks fairly well, but feels pain if she takes a long stride. She has no pain if she bends forward, but hurts if she twists forward. She swims, but now avoids diving. At work she now concentrates on supervision, record keeping and neck and upper extremity therapy. She no longer performs the more rigorous therapy procedures that she handled before the accident.
 
 
 11
 Testimony of Mrs. Ferrero and her husband established that before the accident she was happy, outgoing, unworried, and athletic. She could keep up with people twenty years younger than she. Since the accident her personality has changed. She is apprehensive about little things and is very nervous. She has given up golf, tennis and walking for exercise, and has virtually given up gardening. She has not been free of pains and aches since her injury. Believing that she is unable to perform the full duties of her present position as Chief Physical Therapist, Mrs. Ferrero feels inadequate in her job. For this reason she plans to retire when a replacement is found. The only medications she takes are Benadril, extra strength aspirin, and an aspirin substitute. Her doctors have not prescribed a muscle relaxant, Valium, or pain pills for her back problem.
 
 
 12
 Ten thousand dollars of Mrs. Ferrero's recovery were set aside for the subrogation claim of United States Fidelity and Guaranty Company.
 
 JEAN ROUNTREE KAVIANI
 
 13
 When injured, Jean Rountree was twenty-four years old and a college graduate about to undertake additional work to obtain a teacher's certificate. Since the accident she has begun her teaching career and married.
 
 
 14
 Her hospital discharge summary reflects that she sustained a compression fracture of the first lumbar vertebra, an abrasion and severe sprain of the left ankle and a hematoma of the scalp. She was hospitalized for twelve days, was treated with bed rest, was fitted with a back brace and was walking on crutches when discharged. Her hospital bill was twelve or fifteen hundred dollars. After she left the hospital she was treated by the orthopedic surgeon who treated Mrs. Ferrero.
 
 
 15
 On October 5, 1974, she complained to the doctor of some back pain, tightness of the left calf and ankle and an inability to dorsal flex or elevate the foot. X-rays showed early healing of the vertebra with no increase in wedging or compression. By October 21, 1974, her walking had improved. The doctor believes that this was her first day back at work. She had gotten tired, but had not complained of back pain. Her ankle was causing some discomfort. She was instructed to continue her ankle and back exercises.
 
 
 16
 When examined on November 19 she complained of occasional pinching pain in her back. Otherwise she had no complaints, but still lacked some range of motion. On December 14 she stated that she had occasional pulling sensations, like tightness, in her back, but did not complain of pain. On that date, over three months after her injury, the doctor first reported her mentioning a problem with her knee, which had locked occasionally over the last month. Examination revealed that the knee was tender, but had no excess fluid, that the ligaments were intact, and that there was no grating or popping within the joint. X-rays showed no damage to the bone or joint surfaces.
 
 
 17
 By January 25, 1975, Miss Rountree had found that she was unable to hyperextend her knee, even though there was less catching within that joint. The doctor questioned whether she might have sustained some type of injury to the kneecap or to the attached tendons.
 
 
 18
 In March 1975 she told the doctor that her knee was much better. She had not experienced any more locking episodes but had noticed mild discomfort when carrying objects upstairs. The left knee did not allow full flexion when she was squatting down and it ached if she sat for a long period. She had been swimming regularly. The doctor testified that ordinary walking didn't bother her. She stated her back felt fine at that time and she had done a lot of somersaults without problems.
 
 
 19
 Miss Rountree's next and last visit with the witness was on January 31, 1976. She reported at that time that her knee had begun bothering her during the Christmas holidays. It started clicking and she had some sharp pains under the kneecap. Her examination was negative except for mild pain from pressure over the upper portion of the kneecap. X-rays of her first lumbar vertebra showed that although the bone had solidly healed, there was some narrowing of the interspace between that vertebra and the twelfth dorsal.
 
 
 20
 The doctor also agreed that arthritic changes around this patient's fracture site are probable, although none were observed at the time. There were also no neurological deficits or nerve root irritations. He opined that this plaintiff's condition was caused by her injury of September 2, 1974, that it was permanent and that she had some "physical impairment," which is different from disability. The doctor recommended that Mrs. Kaviani's knee be inspected by a procedure called arthroscopy, which is the introduction of a small scope-type instrument into the knee joint. He does not know whether this was ever done.
 
 
 21
 Jean Rountree Kaviani's testimony, which we accept as accurate for present purposes, discloses that she has experienced much more difficulty than she apparently revealed to her doctor. She states that she is still having extreme problems with her knee. She wears a self-prescribed Ace bandage. Her knee has buckled on numerous times. Standing for fifteen to thirty minutes is very painful to her knee. Her ankle clicks and is weak. A few weeks before trial it gave way. Her back is weak and aches; she becomes tense in the middle of the night and has difficulty lifting things. She is always conscious of the constant pain in her back.
 
 
 22
 At the time of trial Mrs. Kaviani was earning $8,700.00 per year as a teacher. She testified, however, that because of her knee and back problems she did not feel that she could complete the year without further medical aid.
 
 
 23
 Seven thousand one hundred and six dollars of Mrs. Kaviani's recovery were set aside for the subrogation claim of Texas Employers Insurance Company. Mrs. Kaviani testified that she had to postpone obtaining her teaching certificate because of her injury. She lost $8,228.00 in wages as a result.
 
 THE AWARDS OF THE TRIAL COURT
 
 24
 The trial court did not itemize its findings and conclusions of damages as required. Fed.R.Civ.P. 52(a). See Hatahley v. United States,351 U.S. 173, 182, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); Lettsome v. United States, 434 F.2d 907, 909 (5th Cir. 1970). The point was not preserved by the government, and thus it is not entitled to complain of such noncompliance. We are nonetheless placed in the disadvantageous position of having to review a bald finding and conclusion that each of the plaintiffs has been damaged to the extent of $650,000.00.
 
 
 25
 The government advances a number of theories to explain the lower court's error. Perhaps the awards included punitive damages, a possibility suggested by plaintiffs' closing argument. Or perhaps, future inflationary trends were considered in setting plaintiffs' award contrary to our decision in Johnson v. Penrod Drilling Co., 510 F.2d 234 (5th Cir.), Cert. denied,423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975). These theories are too speculative for our use and we decline to embrace them.
 
 
 26
 Both parties cite Texas cases that purportedly support their respective contentions as to the awards proper for each plaintiff. They do not disclose any peculiarities in state law that would substantially alter our conclusions regarding the measure of damages applicable in this case. The illustrative effect of the cited cases, most of which are distinguishable either as to time, type of injury, degree of disability or pain and suffering experienced, provide little more than a general flavor as to trends of awards in Texas.[1]
 
 
 27
 After drawing on all of the help provided by the briefs, arguments of counsel and the illustrative cases reviewed, we are left with the following definite and firm convictions:
 
 
 28
 (1) Mrs. Ferrero was severely and painfully injured. She has recovered, but permanently retains a partial disability, some pain and impairment of her enjoyment of life. We do not minimize these residual effects, but the amount awarded by the district court is close to double the outer limits of a maximum reasonable award.[2]
 
 
 29
 (2) Mrs. Kaviani's case is more difficult. She was seriously and painfully injured, but has essentially recovered. Her counsel very pointedly elicited that she retains "some physical impairment." She continues to have pain, but has no demonstrable physical disability. She has begun her teaching career and has married. Six months after her injury she reported to her doctor that walking didn't bother her, that her back felt fine and that "she had done a lot of somersaults . . . without problems." The curious complaints with her knee pose something of a dilemma. She is entitled to be compensated for all injuries caused by the government's negligence. Her complaint, however, is essentially subjective. The difficulty with her knee is unknown as to its nature and duration, and she has declined further diagnostic procedures that might resolve the question. We readily acknowledge that compensation for this young woman presented the trial court with a challenging problem. Even so, we conclude that the amount awarded was several times the maximum that could be termed reasonable under any of the circumstances disclosed by the record.
 
 
 30
 Having determined that corrective action must be taken, the question remains whether we should remand the case to the trial court or whether this court should reform the award. We noted in Simpson v. United States, that if a remand would be mere wasted motion this court would recompute the award. The evidence before us is, of course, as complete as it was at trial, and we perceive no reason to avoid taking the requisite corrective action. Viewing the evidence in the light most favorable to plaintiffs, we find that the evidence only supports maximum awards of $375,000.00 for Mrs. Ferrero and of $150,000.00 for Mrs. Kaviani.
 
 
 31
 The district court's judgments are vacated and the cases remanded with directions that judgment in the amount of $375,000.00, less $10,000.00 to be set aside for United States Fidelity and Guaranty Company, be entered for Nancy N. Ferrero, and that judgment in the amount of $150,000.00, less $7,106.00 to be set aside for Texas Employers Insurance Company, be entered for Jean Rountree Kaviani.
 
 
 32
 VACATED AND REMANDED.
 
 
 
 *
 District Judge of the Middle District of Georgia, sitting by designation
 
 
 [1]
 Two cases are close enough factually to be of more use than the others. Garcia v. Bauer Dredging Co., 506 F.2d 19 (5th Cir. 1975) ($163,154 awarded seaman who sustained severe back injury necessitating that he give up job); and Bohannon v. Tandy Transportation Co., 402 F.Supp. 783 (N.D.Texas 1975) (plaintiff who suffered back injuries and diminished earning capacity awarded $300,000)
 
 
 [2]
 For example, if she had sustained total disability, a finding the record would not support, the present value of the total of her lost wages from the date of judgment ($13,780.00 per year) to her 65th birthday (computed at 6% And using current wage rate) would be less than $100,000